May it please the court, Jason Carr, appearing on behalf of appellant and petitioner Albert Medina. At essence, this case is about the right to confrontation, the concomitant right to cross-examination, the very vehicles, the crucible of truth-finding in the U.S. court system. But another, what this case also illustrates is the wisdom of the old maxim that there are two sides to every coin. Because the facts, the law, and the arguments in this case illustrate that. The facts, what makes this case seem somewhat reprehensible at first blush, a heinous crime, the fact that this is... Reprehensible to who? Who does it... To the general public, to the lady. Your first impression of this case when you read about this elderly rape victim, the visceral reaction is severe for most people, I would submit. But those very aspects of the victim, the fact that she's a stroke, the alleged victim that she is has strokes, that she had mobility problems... You may want to just argue the law, what you want to... Because whether it was reprehensible or otherwise, we're going to decide the case on the merits. But the point that I... I understand that, Your Honor. But the point I'm trying to make here is the fact that she wasn't subject to cross-examination, she couldn't appear as a witness, the very infirmities that perhaps give the case a negative blush also undermine the validity of the verdict in this case. Because in this case it would have been crucial for the jury to have been able to examine her ability to recall the events, her ability to relate what happened in this case where consent was in defense, to explain the circumstances for the jury to look this person in the eye, for her to be subject to cross-examination. None of those things occurred in this case. And this very case was tried based on her statements to two various witnesses. We couldn't have any murder trials then, could we? Excuse me? I said we couldn't have any murder trials under that theory. Because the victim's dead. Well, in a murder trial you're going to have, of course, the body, which speaks volumes. Well, let's say she's dead. Nobody disputes this witness is dead. Yes, she died before even the grand jury... Right, she's dead just as any murder victim is dead. So the fact that you don't have the victim alive to testify isn't the end of the problem. That happens regularly. It does happen regularly. And the impact on the right to a fair trial, your Sixth and Fifth Amendment rights to a fair trial and to cross-examine and confront witnesses, it's going to be factually dependent. In this case, the fact that she wasn't available for cross-examination undermined all validity in this verdict because of the nature of the case. In a murder case, you're going to have a body. And as I said, the body can speak volumes when you read a murder transcript trial. From etymology, the fact that the larvae in the body tells you time of death, how the body died, the physical effects on the body, there's usually some kind of precipitate witness, there's a motive, there's all kinds of things you're going to get in a murder case you're not going to get out of this case. And what also makes this case unique is that the defense is consent. And the two sides of a coin, in this case, really the forensic evidence is equivocal for the state at best. The forensic evidence is consistent with the theory of defense, which was consent. Consistent, both the state expert and the defense expert. All they have to disprove the element of consent are the hearsay statements of the victim, and there are two brands of them. And one thing that I want to leave the impression with the court is they can't be viewed in isolation. The state wants to take this divide and conquer approach to the two hearsay clusters, if you will. Mr. Carr, assuming we conclude that what you call the hearsay testimony of the victim was properly admitted, then there's plenty of evidence, right, from which the jury could find non-consent. You agree to that? I do not. You don't think there's, you know, the statements you made to the neighbors and the statements you made to others is sufficient evidence of non-consent? If they are admissible, I'm sorry. I said if they're admissible, there's no question there's sufficient evidence of lack of consent, right? Well, it's a confusing question to some extent because the Nevada Supreme Court and everybody has agreed that the hearsay statements of the nurse violated the Confrontation Clause. Well, since you want to talk about that, then let's go to that then. I said let's assume it's admissible, but you don't want to assume it's not. First of all, the first question is, is it admissible under Nevada evidence law? That's a state law question, right? No, no, that's an excellent question. So, well, the Nevada Supreme Court found... It's also a state law question, isn't it? No. It can be and it cannot be. In this case, I would submit it is not. And, in fact, the very case cited by the state now, I may be a little confused by the question because the Nevada Supreme Court found that the testimony of the nurse was inadmissible as a matter of U.S. constitutional precedent, Crawford and such. They found that the testimony of the neighbor was admissible under Nevada evidentiary rules. So if we're talking about the admissibility of the evidence of the neighbor, the excited utterance exception, then we can look at the case that the state relies on as their primary authority, which is Hawley v. Yarborough. And what Hawley v. Yarborough talks about are these Supreme Court precedents, such as Davis, Delaware v. Ardsell, and Michigan v. Lucas, which talks about how the right to confrontation in a cross-examination is not completely encapsulated or codified by rules of evidence. All right. So let's forget the Nevada rules of evidence. And let's go straight to the Constitution. Now, do you think you adequately raised the confrontation clause issue in your opening brief? Oh, absolutely, Your Honor. In fact, the state, I think that their objection is that we didn't raise the issue that, which gets to what the Court is asking about, that we didn't adequately raise the question of the hearsay statement from the neighbor. If that was erroneously admitted, how does that factor into, does that have a substantial injurious effect on the verdict because it rendered the trial fundamentally unfair? The state in our answering brief tries to say we didn't preserve that issue, but that is not true. In our reply brief in the district court, and both on and on appeal, we argued both that it was a confrontation clause violation and also that even though it may have been admissible under the Nevada rules of evidence, it had such a pernicious impact on the verdict, the violation, on the jury's verdict, a violation of the constitutional right to confrontation and cross-examination, that that trumps the fact that it was admissible under Nevada rules of evidence and still leads to a constitutional violation. And that is talked about in this Court's case in Hawley v. Yarborough. If there's a constitutional violation from that, it's not the confrontation clause, is it? Because you said the reason it violates the Constitution is because it's so pernicious. The confrontation clause has nothing to do with perniciousness, does it? Well, I guess maybe I'm confusing. There's two prongs to the inquiry in the habeas proceedings. The first is, was there a constitutional error? The second prong is, did that error have a substantial injurious effect on the verdict? Right. So partly what I'm speaking to is what was the effect on the verdict and whether it rendered the trial fundamentally unfair. The first question was the error, right? Right. And under Nevada, I would argue that you're right if it was a pure rule of Nevada evidence that say that they introduced pornographic magazines that the client should have had hypothetically, that the client had and used that as evidence, and that violates some rule of evidence. That's not a constitutional issue. What makes this a constitutional issue is that even if it was admissible under Nevada rules of evidence, it can still be, and the Holly B. Arbrill case talks about this, it can still be so violative of the defendant's right to confrontation and cross-examination that it violates the U.S. Constitution. But here's one thing that I want to make sure I stress, is that even if the testimony of the neighbor, Dorothy Golden, is admissible, this court finds that there's no constitutional error there. What is clearly constitutional error is the testimony of the nurse. And the Nevada Supreme Court found that was a violation of property, a violation of the right to confrontation. And nobody is, the state has not in any way argued that that was an erroneous ruling or contrary to Supreme Court law. So the question is, does that have a substantial and injurious impact on the verdict? And you cannot look at that statement in isolation from the neighbor's statement because the two together are greater than they are separate. There's synergy between the two statements. Golden's statement, that nursing statement is given. Is that another way of saying the cumulative? Yes, that's another way of saying it. But the state doesn't want you to look at it that way. You know, one of the things that may pose a problem, and you can tell me that you think it does not, there were certain statements made based on objective facts that could be the proof to disprove living or dead. For instance, she answered the door in bloody pants, underpants. If she answered the door in bloody underpants, and we know how soon after that happened she died, somebody would have some bloody underpants or not have some bloody underpants. And if you were defending and you want to say, oh, it didn't happen, I can prove they're telling a lie because here we don't have this, we don't have that. Objective facts rather than just the statement of the person. Do you see what I'm asking? Yeah, the observation of the witnesses is immiscible. And that is some evidence, but it's not powerful evidence. Bruises. Well, the bruises, that was pretty, the bruising evidence, that was undermined seriously by the power of cross-examination during the trial. I mean, the defense attorneys brought out this bruising. It might have been undermined, but somebody believed it. That's why they found it. Or did they believe the hearsay statements? That was the much more powerful evidence. They say, even take the underwear. When she comes to the door, Dorothy Golden says, oh, yeah, these are blood-stained underwear. But they never found that. There was no pictures of any blood-stained underwear at trial. There was some underwear, some spotting that was consistent with an elderly woman having consensual intercourse, according to the experts. So even that, and that just goes to the power of cross-examination. And another example of that in this case, another objective evidence you may point to, was that the state made a lot of noise about, oh, there's this hair. Dorothy Golden said that her hair was pulled. We found all this hair in a garbage can. How about the light on overnight? It wouldn't normally be left on overnight. Oh, on the patio? Which caused the neighbor to come and check it in the first place. Well, there's no question that this would – I'm not suggesting, I'm not trying to retry the case. But I'm just, as you make your argument, I'm wondering if you're ignoring the fact that there are some objective factors that were consistent with the statements that were made. I'm not ignoring it, but I think that they aren't entitled to a lot of weight. Just like I was saying about the hair. Who decides on what weight is to be given? Well, we have to to some extent, because we have to determine whether the erroneous information of the hearsay statements had a substantial and serious impact on the verdict. And what information? This could reasonably be drawn from those facts. A question for the trier of fact. Well, but take the hair that the state brings out. Oh, there's this hair that's consistent with the statement that she had her hair pulled. But on cross-examination, the defense brings out there was hair in a garbage can underneath her comb and brush. That was consistent with, like, when you comb your hair, you take the hair out and you throw it away. And that shows the power of cross-examination. And that's what was lacking on the pivotal evidence here, which was the hearsay statements of these victims. And the courts think that there's no question that this alleged victim was suffering from some kind of emotional trauma. But we don't... Is it a product of the fact that she's a stroke victim? Is it a product of the fact that she was raped? Is it a product of the fact that she's suffering from some kind of dementia? Is it a product of the fact that she was blackout drunk, which was evidence she had done before? We don't know. Are those questions you're raising questions of law? They're questions of law and fact. But I think that the court does have to make that inquiry to determine whether what the state has already said was an erroneous admission of evidence of constitutional violation, whether that had a substantial and injurious effect on this verdict. And the fact that the other forensic evidence is subject to reasonable explanation and is not necessarily indicative of guilt is significant in that inquiry. Just a minute. Backing up a little bit, what's your response to the argument that the victim statement, what's her name? Breyer. The alleged victim statement. Right. To the neighbor, Golden, is not covered by the Confrontation Clause at all anyway because it's not testimonial. Well, that's a good question. Crawford is one variation. I hear you like a good answer. I'm going to try. Crawford is one variation, a clear variation, of the right to confrontation and cross-examination. If you meet the contracts of Crawford, you've met your burden of proving a constitutional violation. But there are others. There are other ways that the constitutional right to confrontation and cross-examination can be violated, and the Holly V. Arbrill case is a perfect example of that, where it was a constitutional violation because the defense was not able to cross-examine the witness adequately about the facts of the case. I mean, here there's no cross-examination of all, at all. And one thing I will note, I just want to note before I sit down, about the excited utterance, even if you find the initial statement, when she opens the door, the victim, the alleged victim, says, oh, look at me, I've been raped. That, even though it's 19, 20 hours after the incident, I could not find a single case that sanctioned that. You don't want to misquote it, do you? Excuse me? You don't want to misquote it, unless you want to say, I'm summarizing. She didn't say, look at me, I've been raped. The first argument out of their mouth, the closing argument, that's what they said she said. Is that precisely what she said? Yes. That's what they say that she said. Look at me, I've been raped. Yes. Look at me, look at me, I've been raped. You look again at the record and you'll see what she said. Well, that's what this statement, that's the first statement they say out of their closing argument, is supposedly Herbert. Look at me, I'm a mess. Didn't she say more than just, look at me, I've been raped? I think that was Golden, Dorothy Golden's interpretation of the way she looked, her observation. Now, I could be wrong, but anyways, the first, my point is the first statement, I could be wrong about the exact quote, but the first statement out of her mouth when she opens the door, maybe that's an excited utterance. But the extended, when they go in and they have extended conversation about it, and remember that Ryer can't really speak, so it takes a long time to get anything out of her to say anything. This extended conversation, all that's an excited utterance too, and all those facts that they had, this extended narrative on the couch in the apartment, those are pivotal to the trial. Well, just a minute, I want to go back to a variation of my first question. What difference does it make whether or not it's an excited utterance? Well, then it wouldn't have been admissible even under Nevada law, so they wouldn't even have that argument. It would just be purely inadmissible, pure violation of the right to conversation. The Nevada court found it admissible, right? Right. We're not going to review that question, are we? Whether it was an excited utterance or not? So what difference does it make? Well, it makes a difference if, first of all, if the fact that it makes a difference in a couple of contexts. The first is that even though it may be admissible under Nevada law, it can still violate the Constitution. The Constitution trumps rules of evidence. That's what the Hawley v. Arboro case says. The second thing is that even if it is admissible under this theory in the Nevada Supreme Court, you have to determine how much weight to give that statement, because we have to determine whether the admittedly unconstitutional statements of the nurse violated my client's right to a fair trial. And the state, what's the first thing the state says when they talk about sufficiency of evidence? Oh, it was like the nurse's statements should have been substantiating the verdict. And those are consistent with Dorothy's statements. The consistency, the state argues, is why there wasn't substantial and injurious effect on the jury's verdict. So that not only are they admissible, but what weight do we give those statements? The Dorothy Golden statements is important for determining substantial and injurious impact. But I'm out of time. I don't know if the Court has any questions. Thank you. We'll give you two minutes to rebuttal. Good morning. My name is Jared Frost. I am a deputy attorney general. I'm representing the Respondent's appellees in this matter. And originally there were three issues in this case. I think for all practical purposes we're now down to one. There was a sufficiency of the evidence claim. That claim was premised on the argument that in conducting Jackson's analysis, this Court would not look at evidence that was allegedly admitted improperly. As was pointed out in our brief, the United States Supreme Court has decided in McDaniel v. Brown that this Court looks at all evidence presented at trial, irrespective of whether that evidence was admitted properly when conducting that analysis. There's been no suggestion that, absent that exclusion of evidence, that there was an insufficiency of evidence in that claim. There was also a claim that there was a fair trial or due process violation with respect to the statement of the witness Dorothy Golden, the neighbor. We have argued that in the district court, the theory presented there was a confrontation clause theory, that that was abandoned, and that this is an uncertified or a waived issue. But even if this Court were to consider the fair trial or due process question, it should be rejected under Hawley because, as this Court found there, the Supreme Court has not determined that the admission of overtly prejudicial evidence can constitute a due process violation sufficient to warrant habeas relief. Now, the other problem with this claim is that there's been no discussion or explanation of how the victim's statement to Dorothy Golden was unfair or overtly prejudicial. Of course, all the evidence that's there... Well, it's unfair because there was no opportunity to cross-examine. I mean, isn't that the gist of his argument? That may be, Your Honor. At the same time, there was a lot of objective evidence that was consistent with the victim's statement. It's not clear that this was unfair in the sense that the Estelle Court was looking at, for example, where they were looking at prior bad act evidence where the jury could maybe improperly infer guilt based on the prior bad act evidence. And so I don't think there's been a good demonstration or explanation here of how this could be so prejudicially unfair that the due process clause has been passed. I'm getting a little confused by the briefs and the argument. You're saying the statement of Dorothy Golden isn't prejudicial because there are other statements or other evidence which demonstrates it's not prejudicial. Well, it's prejudicial in the sense that it's incriminating, of course. What I'm saying is that any alleged unfairness is mitigated by the consistent evidence, the physical evidence that was present in this case. And the other evidence by the other witness. Correct. The other observations of the police officers. The other statements made to the nurse. Is that the corroboration? That's part of it, Your Honor. But there's also the corroboration. And the statements made to the nurse aren't prejudicial because of Ms. Golden's statement. Essentially, yes. So each one, if it's not constitutional in itself, is because of the other statement, which may not be constitutional to itself. Well, Your Honor, the nurse's, the victim's statement to Nurse Adams was found to be admitted improperly under a confrontation clause. The statement to the neighbor, Witness Golden, was found not to violate the confrontation clause because that statement was not testimonial. And, of course, what the district court pointed out was that there's been no Supreme Court authority to address that. Well, if there's no violation, then you don't have to go to the prejudice. But I thought we were going to the prejudice on the theory that even if it's unconstitutional, it's corroborated, so it wasn't prejudicial. I think that the harmless error analysis is proper when considering whether there was a substantial injurious effect on the verdict based on the statement to Nurse Adams. Well, my question, can you corroborate each unconstitutional statement, if it is, with the other unconstitutional statement? That is one part of what I believe is the evidence in this case that corroborates either of the victim's statements. As I mentioned before, there were very extensive evidence of injuries that the victim received in this case. I have no problem with that statement corroborated by physical evidence. It just seemed to me as I read the briefs and as I listened to the argument. I thought the injuries were – there was some testimony that the injuries were consistent with consensual sex. That's correct, Your Honor. It doesn't corroborate either side, necessarily. Well, Your Honor, I don't think this was a he-said-she-said scenario in which the evidence was equally consistent with both statements here. The defendant took the stand at trial and testified that, of course, the sex was consensual, that he – that the victim did not notice any – or he did not notice any bleeding at any time, that the victim never complained of pain, and that the victim, quote, smiled at me when I walked out. That's, of course, inconsistent with the victim's extensive injuries, the blood, hair, and other physical evidence found at the scene of the assault, and the multiple witness observations of the victim's demeanor after the assault. That includes two police officers who interviewed her after the assault, of course, Witness Golden and – The nurse. And the nurse, right. Well, there were a lot of things that were consistent with consensual sex. For example, they was at her house, not at some strange place that they may have been. He was in her house, and he was in her house with her commission. It wasn't that he broke and entered. They were dancing, playing music and dancing. They were playing music and dancing. Nobody disputes that. There were lots of things consistent with consensual sex. That was what he testified to, yes, and there was also testimony from – That's what he testified to, and there was nothing denying it. Nobody said it wasn't so, did they? No, of course. The victim died before trial, and so there was no – There was nobody in position to say it wasn't so. That's correct, Your Honor. What I think the jury would have – what we can infer that the jury realized is that – I don't think we're going to retry the case. All the thing you were saying is something consistent with this. Well, I was just pointing out to you, yes, but there's also a lot consistent with consensual sex. So we have to then look to see what might have made the difference in this case. Right. And, well, I think what that is is specifically the evidence that was presented about the victim's age and her health problems in order to have the kind of extensive injuries, the bruising, the torn labia, the rectal injuries that was all presented here. This, I think – Was there testimony that the injuries were not consistent with consensual sex? I think the testimony was that they were at least within the realm of conceivability in the human experience. But what was also true was that this was a 69-year-old woman who rode a scooter to the mailbox. She was not the kind of person that the jury would have believed would have engaged in the kind of very rough sexual activity that would have been required to result in these types of injuries. And I also think it's important when trying to determine whether the victim's statement to the nurse resulted in a substantial and injurious effect on the verdict, it's important to consider what the defendant's trial strategy was in this case. He essentially admitted, conceded all the elements of the offense except for consent. And so, in other words, everything depended on the jury believing his version of events in this case. And as I've said, that is very much inconsistent with the physical evidence, the later observations, her demeanor in this case. And nobody's arguing about it, and I'm not so sure they could, but you sure got a healthy sentence, didn't you? Yeah, I believe so, Your Honor. And, you know, to close, I'd like to just read a short passage from Dorothy Golden's testimony to give you just a sense of what this evidence or that this encounter was consensual. And I'm reading here on page 659 of the record. And this, of course, is Witness Golden, who has become concerned about her friend, Francine Ryer, because her light, her porch light has been left on. And she goes to the door, she knocks at the door, and nobody answered. So she starts to yell and identify herself, and finally the door opens, and this is how she describes the victim when the door opens. It says, quote, she was pale, her left arm was bruised, her throat was bruised, and she was pale. And she just said, look at me, look at me, I've been raped. And I stood there horrified, and she said, you're not saying nothing. I said, what are you telling me? She said, look at me, just look at me, I've been raped. And she opened the door, and she was crying, and I went in. She was quite pale, and she was just shaken. And I sat her down. She had on a bra and panties, and her panties were drenched in blood. And she had cuts on her thighs, and her hair was all over her head, and she just looked like a ghost. She just looked horrified, unquote. And so the reason I point this out is that this, in the State's view, this was not a close case. This was a case that there was powerful evidence. I think that's clear. Even ten years on, on a cold record, that this was very powerful testimony. And this is not even the most specific testimony that Gwyneth Golden offered concerning the rape. And so for all these reasons, the district court's determination that the statement to the victim's statement to And if there are no other questions, I will submit. Thank you, counsel. Just to clarify, just because I choose to focus on here at oral argument, I don't mean to concede any other issues. There are three viable issues. And, in fact, the sufficiency of the evidence issue is a good issue, and it dovetails right in with everything else. Regarding the physical state of the evidence, once again, as I said, it's equivocal. And one key factor about when the officers went into the room was that there was no evidence of there having been a physical tussle. None of the furniture was out of order. There was no plates shattered on the floor, none of those things. And also the physical evidence was that two people were drinking alcohol together in each other's company voluntarily, which, once again, goes to the consent theory. Another aspect, though, that I didn't talk about, about the statements made by the alleged victim here, Francine Reier, is that, and it's really clear when you read the nurse's testimony, which is right around page 608 of the excerpts of record, that her ability to speak is so limited that people basically have to give her leading questions and ask her things. She doesn't really talk even to the nurse. If you read her testimony, she basically fabricates the statements that she said. It's like a complete leading examination of this alleged victim that becomes filtered out to her actual statements. But she doesn't really have the ability to express herself. And all these details, like from Dorothy Gold and the neighbor, and unfortunately this wasn't explored enough at trial, but how was she even able to understand her in these details? The worst thing out of Dorothy's mouth is you could barely understand anything she was saying. Her speech was even worse than it usually is because of her cognitive disabilities and her stroke. And we don't even know how many strokes she had, one or two. So not only do we have hearsay statements that filtering, but we have hearsay statements that are basically the product of other people putting words in her mouth that are then given to the jury. It's like triple, quadruple hearsay. And that makes it more unreliable, and its importance in this verdict cannot be denied. My client was not given a fair trial, and his conviction is to be reversed. Thank you. Any questions? No. Thank you, counsel. The case is argued, will be submitted. The court will stand in recess.
judges: Farris, Reinhardt, Tashima